UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| INVACARE CORPORATION, | ) | Case No.: 1:04 CV 1580 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| RESPIRONICS, INC., | ) | |
| | ) | |
| Defendant | ) | ORDER |

Now pending before the court is Defendant Respironics, Inc.'s ("Defendant" or "Respironics") Motion for Summary Judgment (ECF No. 60) and Plaintiff Invacare Corporation's ("Plaintiff"or "Invacare") Motion for an Order Pursuant to Rule 56(f) Denying Respironics' Motion for Summary Judgment (ECF No. 62).  For the reasons outlined below, the Motion for Summary Judgment is granted in part and denied in part and the Motion for Rule 56(f) is denied.

## I.  FACTS AND PROCEDURAL HISTORY

### A. Facts

Invacare and Respironics each manufacture and distribute products to treat obstructive sleep apnea ("OSA"), a condition in which a person's airway closes during sleep.  One treatment for OSA involves positive airway pressure devices ("PAPs"), which blow air through an air hose into a mask that

is worn by the patient during sleep.  (Mark D'Angelo Aff. ¶ 6, ECF No. 61, Att. 1.)  Invacare and Respironics both manufacture PAPs and masks to treat OSA.

Patients who experience sleeping problems typical of OSA are often evaluated in a sleep lab for diagnosis and treatment.  (*Id.* ¶ 5.)  If PAP therapy is the appropriate treatment, the sleep lab works with the patient to determine the proper level of positive airway pressure to be used during subsequent home therapy. (*Id.* ¶ 8.)  Patients are often uncomfortable sleeping with the PAP and mask, which often causes patients to stop using them at home.  (*Id.* ¶ 9.)  Thus, sleep labs have many different masks available, and work with patients to find the most comfortable mask and PAP.  (*Id.* ¶¶ 10-12.)  Once a PAP and mask are selected, the patient is given a prescription and typically obtains the PAP and mask from a durable medical equipment supplier ("DME").  (*Id.* ¶ 14.) Patients must replace their masks periodically due to normal wear and tear.  (*Id.* ¶ 15.)

For purposes of this motion only, Respironics does not dispute Invacare's allegations that Respironics has a market share of 44% of mask sales in the United States and more than 50% of PAP sales.  (Def. Mem. in Supp. of its Mot. for Summ. J. 3, ECF No. 61; *see* Pl. Compl. ¶ 9, ECF No. 1.) Invacare alleges that Respironics sells its PAPs and masks to sleep labs at below-cost prices.  (Pl. Compl. ¶ 28, ECF No. 1.)  Respironics admits that it provided 591,254 free masks to sleep labs between August 6, 2000, and December 15, 2004.  (David Ruiz Aff. ¶ 6, ECF No. 63, Att. A.)  Invacare alleges that these were below-cost transactions that constitute actionable antitrust violations because they "induce the Sleep Labs to prescribe Respironics brand equipment, thereby destroying any competition in the relevant markets by foreclosing competitors from successfully marketing their products, and eliminating dealers' (and ultimately consumer/patients') options for equipment to treat OSA."  (Pl. Compl. ¶ 30, ECF No. 1.)

-2-

Invacare also alleges that Respironics bundles the sale of its PAPS with its masks, and "offers to sell its masks to [DMEs] at substantially discounted prices so long as the [DME] also buys Respironics' PAPs at the same time."  (Pl. Compl. ¶ 22, ECF No. 1.)

### B. Procedural History

In March 2004, Respironics sued Invacare in the Western District of Pennsylvania, alleging patent infringement.  (Def. W.D. Pa. Compl., ECF No. 17, Ex. A.)  That lawsuit is still pending.

In August 2004, Invacare filed the instant case against Respironics in this court, alleging various antitrust claims, including: (1) monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (3) restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 2; (4) price discrimination, in violation of Section 2 of the Clayton Act, 15 U.S.C. § 13(a); (5) violations of the Valentine Act, O.R.C. §§ 1331.01, 1331.04; and (6) unfair competition.

Soon after Invacare filed this case, Respironics moved to transfer the case to the Western District of Pennsylvania and consolidate it with the ongoing patent litigation there.  (ECF No. 14.)  Respironics also sought to disqualify Judge John M. Manos, the original Judge on this case, for a conflict of interest. (ECF No. 18.)  Judge Manos denied both these motions.  On an interlocutory appeal, the Sixth Circuit reversed in part and ordered Judge Manos to recuse himself.  (5/27/05 Order, ECF No. 38.)  The case was reassigned to this court, and Respironics promptly renewed its motion to transfer or stay.  (ECF No. 43.)  The court denied that motion.  (11/29/05 Order, ECF No. 56.)  In so doing, the court stated:

> It is not at all clear to this court that a judgment for Respironics on its patent infringement claim would dispose of the antitrust claims.  Such a judgment could impact the antitrust claims, or even reduce their scope, as the Sixth Circuit properly noted, but Respironics has not shown that one case is completely dispositive of the other.

(*Id.* at 8.)  The court subsequently held a case management conference and set a December 1, 2006,

discovery deadline and a May 1, 2007, dispositive motion deadline.  (1/9/06 Order, ECF No. 59.)

Respironics promptly filed its motion for summary judgment.  (ECF No. 60.)  Invacare filed both a

motion for a Rule 56(f) order, contending that it needed discovery to respond fully to Respironics'

motion (ECF No. 62), as well as a substantive opposition to the summary judgment motion (ECF No.

63).  Invacare also filed a surreply.  (ECF No. 78.)  Pursuant to order of court, the parties have

conducted only limited discovery pending the outcome of the court's ruling on the pending motions.

(9/6/06 Order, ECF No. 76.)

## II.    LEGAL STANDARD

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to a judgment as a
> matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable

to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th

Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine"

requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the court must

decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving

party] is entitled to a verdict."  *Id*. at 252.

-4-

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

In antitrust cases, summary judgment is appropriate if the claim "simply makes no economic sense." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 467 (1992). While it is true that "[i]n antitrust litigation, summary judgment is particularly disfavored and the standard for granting summary judgment is strict," *Hand v. Central Transport, Inc*., 779 F.2d 8, 10 (6th Cir. 1985), unsupportable antitrust claims are susceptible to summary judgment under the standards outlined above. *See, e.g.*, *Eastman Kodak Co.*, 504 U.S. at 451; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 574 (1986); *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 946 (6th Cir. 2005). However, the Supreme Court also cautioned that courts should "resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" *Eastman Kodak Co.*, 504 U.S. at 467 (quoting *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579 (1925)).

**B. Rule 56(f) Standard**

The Federal Rules of Civil Procedure allow a defending party to seek summary judgment "at any time."  Fed. R. Civ. P. 56(b).  However, "[b]efore ruling on summary judgment motions, a district judge must afford the parties adequate time for discovery, in light of the circumstances of the case."  *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196 (6th Cir. 1995).  The Federal Rules of Civil Procedure provide for continuing or denying summary judgment to conduct discovery:

> When Affidavits are Unavailable.  Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  Under this rule:

> . . . a party opposing a motion for summary judgment is allowed to state that he or she is unable to present facts essential to justify the party's opposition. In that situation, the district court may permit further discovery so that the nonmoving party can adequately oppose the motion for summary judgment. But it is up to the party opposing the motion to state why more discovery is needed.

*Wallin v. Norman*, 317 F.3d 558, 564 (6th Cir. 2003).  The moving party must generally submit an affidavit explaining what further discovery is needed and what facts discovery will uncover.  *Plott*, 71 F.3d at 1196.  The rule does not permit a party opposing summary judgment to obtain a continuance unless the proposed discovery is such that it might rebut the moving party's showing that there are no genuine issues of material fact precluding summary judgment.  *E.g., Good v. Ohio Edison Co.*, 149 F.3d 413, 422 (6th Cir. 1998).  In other words, the discovery sought must have the potential to raise a genuine issue of material fact.        The Supreme Court has clarified that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."  *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (internal citations omitted).

### III.  LAW AND ANALYSIS

As discussed above, Plaintiff's Complaint raises six claims against Respironics: (1) monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (3) restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 2; (4) price discrimination in violation of Section 2 of the Clayton Act, 15 U.S.C. § 13(a); (5) violations of the Valentine Act, O.R.C. §§ 1331.01, 1331.04; and (6) unfair competition.

Respironics contends that Plaintiff's six claims in the Complaint are all based on the same two allegedly illegal activities: predatory pricing and improper bundling.  (Def. Mem. in Supp. of its Mot. for Summ. J. 2, ECF No. 61.)  Respironics' briefing thus addresses these two allegations in detail. Invacare disputes this characterization of its Complaint, and argues that in particular, its restraint of trade, Valentine Act, and unfair competition claims are based on different legal arguments. (Pl. Br. in Opp. 12-13, 28-29, ECF No. 63.)  The court will therefore evaluate Respironics' motion as to Plaintiff's monopolization, attempted monopolization, and Clayton Act claims together, and address the restraint of trade, Valentine Act, and unfair competition claims separately.[1]

#### A. Monopolization, Attempted Monopolization, and Price Discrimination Claims

Monopolization, attempted monopolization, and price discrimination under the Clayton Act each require some proof of anticompetitive conduct within a relevant market.  *See* discussion, *infra*.  As the

---

[1] The court further notes that while each claim in Plaintiff's Complaint has its own specific elements, which Plaintiff has the ultimate burden of establishing, Defendant's motion for summary judgment does not challenge each element of each claim.  Rather, Defendant's motion addresses solely the underlying 'wrongs' or anticompetitive conduct of predatory pricing and bundling.

-7-

determination of anticompetitive conduct must be viewed within the context of a relevant market, the court will first determine the relevant market, and then examine the alleged anticompetitive conduct.

### 1. Relevant Market

Each of the monopolization, attempted monopolization, and Clayton Act claims that Plaintiff asserts require a definition of the relevant market. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 455 (1993) ("[T]he plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power."); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition."). Defining the relevant market is also necessary for a Clayton Act claim. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 & n.41(1962) (citing *United States v. E.I. Du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)). In addition, restraint of trade claims brought under Section 1 of the Sherman Act also require defining the relevant market. *Int'l Logistics Group, Ltd. v. Chrysler Corp.,* 884 F.2d 904, 907 (6th Cir. 1989) (requiring "that the combination or conspiracy produced adverse anticompetitive effects . . . within relevant product and geographical markets" among the elements of a claim).

Summary judgment is appropriate where a plaintiff's proposed relevant market fails as a matter of law and the plaintiff does not allege a legally sufficient relevant market. *Smith v. Multi-Flow Dispensers, Inc.*, 1999 U.S. App. LEXIS 9845, *14 (6th Cir. May 14, 1999) (noting that, although summary judgment is rarely granted on these grounds, "there is not, however, a 'per se prohibition'") (quoting *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997)).

*a. Defining the Relevant Market*

The relevant market is defined as "the 'area of effective competition' – the area over which the defendant has allegedly acquired monopoly power." *Id.* at *8-9.  The relevant market comprises both the geographic market and the product market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  Defendant does not contest Plaintiff's statement that the relevant geographic market is the United States.  (*See* Pl. Comp. ¶ 14, ECF No. 1.)  As the parties dispute the relevant product market to use when analyzing the potential anticompetitive activity, the court must determine the appropriate market.  The relevant product market is defined as those products or services "that are either (1) identical to or (2) available substitutes for the defendant's product or service."  *White*, 723 F.2d at 500.  Although the case law is not uniform, the Sixth Circuit has held that the "determination of a relevant market is composed of the articulation of a legal test which is then applied to the factual circumstances of each case."  *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 499 (6th Cir. 1983).

Defendant contends that the relevant product market is the entire United States market for PAPs or masks (Def. Mem. in Supp. of its Mot. for Summ. J. 11-12, ECF No. 61), while Plaintiff argues that the relevant product market should be limited to the market for mask sales to sleep labs (Pl. Br. in Opp'n to Def. Mot. for Summ. J. 18, ECF No. 63).  Defendant points out that Plaintiff's Complaint defines the relevant markets as "the market for PAPs" and "[m]asks for use with PAPs" in the United States, which is much broader than the narrower definition Plaintiff alleges in its briefing.  (*See* Pl. Compl. ¶¶ 12-14, ECF No. 1.)  Based on Plaintiff's earlier (and broader) market definition, Defendant argues that it would be improper for the court to look solely at the sleep lab market.  (Def. Reply Br. in Supp. of Def. Mot. for Summ. J. 6-8, ECF No. 66.)

-9-

Without ruling on whether Plaintiff improperly changed its proposed product market definition, the court finds that Plaintiff's attempt to define the relevant market as "mask sales to sleep labs" is legally flawed because a product market cannot be divided by type of customer unless the plaintiff can identify a "difference in the *product* supplied to that group of customers." *Smith v. Multi-Flow Dispensers, Inc.*, 1999 U.S. App. LEXIS 9845, *13 (6th Cir. 1999) (citations omitted). In *Smith*, the plaintiff sought to define the relevant product market as beverage dispensing equipment and soft-drink syrup sales to taverns and locally-owned restaurants in the Cleveland area. *Id.* at 10. The court upheld the district court's dismissal of Plaintiff's complaint, holding that the plaintiff's market definition was overly narrow because there was no difference between the equipment and syrup sold to locally owned, as opposed to non-locally owned, Cleveland restaurants. *Id.* at 13-14. Similarly, Plaintiff in the instant case does not allege, nor do the facts indicate, that the masks Respironics sells or gives to sleep labs are different in any way from the masks it sells to DMEs. Thus, Plaintiff has not alleged facts that warrant a distinction between masks sold to sleep labs and masks sold to other customers.

### b. Submarket

Plaintiff's argument that sales of masks to sleep labs is a relevant submarket is also not persuasive. Plaintiff correctly states that a submarket can be an acceptable relevant market. (Pl. Br. in Opp'n 22, ECF No. 63.) *See Brown Shoe*, 370 U.S. at 325. Furthermore, where a submarket is appropriate, "submarket criteria are to be used in conjunction with the basic test to more precisely define the relevant markets." *White and White*, 723 F.2d at 500.

Plaintiff, citing an affidavit submitted by Defendant, contends that Defendant views mask sales to sleep labs as a gateway submarket to larger markets for masks and PAPs. (*See* Pl. Opp. Br. 18, ECF

-10-

No. 63) (citing Mark D'Angelo Aff. ¶¶ 10-13, ECF No. 61, Ex. 1.)  However, the affidavit does not

constitute admission or evidence of a submarket:

> 10. Accordingly, much of the effort in this field, both as to developing
> improved devices and masks, and in the initial evaluation and patient intake
> process, is directed to making the patient comfortable and making the
> therapy easier for patients to tolerate.
>
> 11.  During the evaluation process, patients wear a mask while the medical
> staff is determining the level of air pressure needed for subsequent therapy.
> This evaluation process also provides the patient with an opportunity to
> attempt to become comfortable wearing a mask and to identify any concerns
> that the patient has with doing so.
>
> 12. Having masks available during the evaluation process therefore is very
> helpful to patients.  In fact, it is common for sleep labs to have many
> different types of masks, from many different suppliers, for patients to
> sample and for patients and their clinicians to decide what best meets their
> needs.
>
> 13. Respironics makes a significant effort to educate sleep lab personnel as
> to the benefits of Respironics' masks and how they can and should properly
> be used to help the patient obtain the best results.

(D'Angelo Aff. ¶¶ 10-13, ECF No. 61, Ex. 1.)  These statements do not indicate that sleep labs are a

separate market altogether, but rather a critical entry point into the mask market.  Moreover, neither

these statements nor any other evidence indicates that there is anything different about the masks sold

or given to labs and the masks ultimately sold to consumers so as to justify narrowing the relevant

market to "masks sold to sleep labs."

      Moreover, Plaintiff's request for discovery on the fact-intensive question of submarket definition

is not well-taken.  The "boundaries of such a submarket may be determined by examining such practical

indicia as industry or public recognition of the submarket as a separate economic entity, the product's

peculiar characteristics and uses, unique production facilities, *distinct customers*, *distinct prices*,

sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.  Plaintiff appears to base its theory of a submarket on the lower prices that Defendant allegedly charged to sleep labs – thereby touching on the factors of distinct prices and distinct customers.  (Pl. Br. in Opp'n 22, ECF No. 63) (emphasis added).  However, even a showing of one or both of these factors would not change the fact that Plaintiff's proposed market of mask sales to sleep labs does not take into account all interchangeable substitute products.  *See Brown* Shoe, 370 U.S. at 326 (determining the three relevant product submarkets to be "men, women's, and children's shoes," because "each has characteristics peculiar to itself rendering it generally noncompetitive with the others," among other factors); *Smith*, 1999 U.S. App. LEXIS 9845 at *13-14 (citing three cases "that have held that an antitrust plaintiff may not narrow a relevant product market to a select group of customers without identifying a difference in the *product* supplied to that group of customers").  No amount of discovery will change the fact that antitrust law does not support dividing the market for identical masks based on the identity of the customers or the difference in price.  Accordingly, the court finds that Plaintiff's proposed market definition fails as a matter of law,  and the court will therefore consider the entire mask market for the

purposes of this summary judgment motion.[2]  Thus, Plaintiff's proposed market cannot be limited to

mask sales to sleep labs, and must encompass all masks sold to both sleep labs and DMEs.

_____

[2]      The court notes that it finds Defendant's reliance on *Directory Sales* misplaced.
In *Directory Sales*, a yellow pages phone directory company sued Ohio Bell, the
owner of the Ameritech Yellow Pages, for violating the Sherman Act.  883 F.2d
at 608.  The plaintiff alleged that by giving away free first listings in the yellow
pages to companies who had business telephone service through Ohio Bell, the
defendants were predatorily pricing below cost.  *Id.* at 608-9.  The court granted
the defendants' motion for summary judgment on the plaintiff's predatory pricing
claim, holding:

> Since the Defendants never sell the items they are giving away, first
> listings, they clearly are not giving them away with the expectation
> that customers will continue buying first listings in the future at a
> higher price.  We are persuaded that the first listing is not a separate
> product or market for the purposes of predatory pricing, and that to
> demonstrate predatory pricing [plaintiff] would have to show that the
> Defendants' overall charges for advertising space in their yellow
> pages are priced below cost . . . the relevant area of inquiry should be
> [defendants'] operations taken as a whole . . .  We point out that
> [plaintiff], in its complaint, alleged that the relevant product market
> was the yellow pages market, not the first listings market.

833 F.2d at 614.  Respironics therefore argues that, just as it was incorrect to examine
"first listings" as a separate market of yellow pages sales, it is incorrect to look at sleep
lab mask sales as an independent market of mask sales.  However, the court's ruling in
*Directory Sales* was based on the finding that "[d]efendants do not sell first listings, they
sell subsequent listings."  *Id.*  In the instant case, the facts do not support a similar
finding.  Although Respironics gave away many free masks to sleep labs, Respironics has
not asserted that it *always* gives away, and *never* sells, masks to sleep labs.  Thus,
assuming that sleep lab masks are similar to first listings, the court cannot say Defendant
does not sell masks to sleep labs.  Second, the facts do not support a finding that sleep lab
masks are any different than the regular masks sold to DMEs; there appears to be no
difference between these items.  In *Directory Sales*, on the other hand, the giveaway
products – first listings – were a distinctly different product than the subsequent listings
for sale.  *Id.* (stating that customers cannot buy first listings; they may only buy
subsequent listings).  Finally, there is a difference in the *groups* to whom the products are
given away.  In the instant case, Defendant allegedly gives away masks to sleep labs, and
later sells them to DMEs.  In *Directory Sales*, the audience is the same: business
customers.

-13-

## 2. Anticompetitive Conduct

Each of the monopolization, attempted monopolization, and Clayton Act claims require some proof of anticimpetitive conduct.  For example, a monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, requires proof of: "1) the possession of monopoly power in the relevant market; and 2) the willful acquisition, maintenance, or use of that power either by anticompetitive or exclusionary means."  *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.,* 833 F.2d 606, 612 (6th Cir. 1987); *see United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966).  Likewise, an attempted monopolization under Section 2 of the Sherman Act requires proof of: "(1) a specific intent to control prices or destroy competition in the relevant market, (2) predatory or anticompetitive conduct intended to achieve that object, and (3) a dangerous probability of success in achieving a monopoly."  *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp. 455, 465 (S.D.N.Y. 1996) (citing *Spectrum Sports v. McQuillan,* 506 U.S. 447, 459 (1993)).  Finally, a Section 2 Clayton Act claim requires a showing of "a reasonable possibility that a price difference might harm competition." *Falls City Indus. v. Vanco Beverage,* 460 U.S. 428, 434-35 (1983); *see* 15 U.S.C. § 13(a).  Thus, underlying each claim is proof of an anticompetitive act.

Plaintiff's Complaint alleges two specific anticompetitive acts with respect to these three claims: predatory pricing and product bundling.  (Pl. Compl. ¶¶ 32, 39, 47, ECF No. 1.)[3]  Respironics contends

---

[3]     Plaintiff's monopolization and attempted monopolization claims each allege both predatory pricing and bundling by name.  (*Id.* ¶¶ 32, 39.)  Plaintiff's Clayton Act claim alleges only price discrimination.  (*Id.* ¶ 47.)

The Supreme Court has held that price discrimination claims under the Clayton Act should be treated the same as predatory pricing claims under the Sherman Act:

> [P]rimary-line competitive injury under the Robinson-Patman Act
> [which amended the Clayton Act] is of the same general character as

-14-

that as a matter of law, Plaintiff cannot establish that either act was anticompetitive and, as such, Plaintiff's monopolization, attempted monopolization, and price discrimination claims must fail, despite the discovery Plaintiff seeks.

The court rejects Plaintiff's contention that a court should view Defendant's conduct "as a whole" rather than examine specific anticompetitive conduct. First, Plaintiff's Complaint alleges specific conduct (*Id.* ¶¶ 32, 39, 47), so the court must assess whether Plaintiff's allegations survive as a matter of law. Second, examining a defendant's anticompetitive conduct as a whole entails evaluating the overall effect of specific instances of anticompetitive conduct. *See Le Page's, Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of [the defendant's] exclusionary practices considered together.") The *Le Page's* court, on which Plaintiff relies, first examined each of the types of conduct that the plaintiff had alleged – exclusive contracts and bundled rebates – and, after finding evidence of such bad acts, then viewed those actions together. *Id.* ("The anticompetitive effect of 3M's exclusive dealing arrangements . . . cannot be separated from the effect

---

the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act. . . . [W]hatever additional flexibility the Robinson-Patman Act standard may imply, the essence of the claim under either statute is the same: A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market. . . .

Accordingly, whether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, two prerequisites to recovery remain the same.

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221-22 (1993). As such, the court's discussion of predatory pricing will incorporate and apply to Plaintiff's price discrimination claim as well.

of its bundled rebates.)  Consequently, the court must first find that Defendant has done something wrong before the court can view such conduct in the aggregate, as Plaintiff requests.  Accordingly, the court looks to the conduct alleged in Plaintiff's Complaint, namely, predatory pricing and bundling. (Pl. Br. in Opp'n ¶¶ 32, 39, 47, ECF No. 63.)

*a. Predatory Pricing*

Predatory pricing has two specific elements: (1) "that the prices complained of are below an appropriate measure of its rival's costs";[4] and (2) "a demonstration that the competitor had a reasonable prospect, or . . . a dangerous probability, of recouping its investment in below-cost prices."  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993).

1. Pricing Below Cost

Having determined that the relevant market is the U.S. market for masks, the court must first assess whether Defendant's mask prices were below cost in that market.  Defendant posits that because

---

[4] Plaintiff argues that it can establish a predatory pricing claim without proving a below-cost price.  (Pl. Br. in Opp'n 19-20, ECF No. 63.)  This argument, and Plaintiff's discussion of *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 946 (6th Cir. 2005), are legally inaccurate.  *Spirit Airlines* notes that "in certain situations, a firm selling above average variable cost could be guilty of predation."  *Id.* at 938 (quoting *D.E. Rogers Assocs., Inc. v. Gardner-Denver Co.*, 718 F.2d 1431 (6th Cir. 1983).  This quote refers to the debate as to whether average variable cost or average total cost is the appropriate measure of cost to evaluate predation.  *See, e.g.*, *Brooke Group*, 509 U.S. at 223 n.1.  *Spirit Airlines* **does not** hold that a party could show **predatory pricing** without any type of below-cost pricing.  To the contrary, *Spirit Airlines* quotes the Supreme Court's statement that "we have rejected elsewhere the notion that above-cost prices that are below general market levels or the cost of a firm's competitors inflict injury to competition cognizable under the antitrust laws." *Spirit Airlines*, 431 F.3d at 937 quoting *Brooke Group*, 509 U.S. at 223).

As discussed in Section III.B.2, *infra*, a party may show, however**, other** anticompetitive, exclusionary conduct – such as bundling – in the absence of below-cost pricing.  *See, e.g.*, *LePage's, Inc.*, 324 F.3d 141 (3d Cir. 2003).

Plaintiff alleged that Defendant's mask prices were artificially high, Plaintiff has admitted that the prices, by definition, are not predatorily low. (Def. Reply Br. 6, ECF No. 66; Def. Mem. in Supp. of its Mot. for Summ. J. 12, ECF No. 61.) Plaintiff's Complaint does allege that Defendant's prices are "artificially high" (Pl. Compl. ¶ 32, ECF No. 1); however, Plaintiff states in its opposition brief that "Invacare does not concede, in the cited allegations, that Respironics' average price throughout the relevant markets – even taking into account supracompetitive retail pricing – are above its costs." (Pl. Opp'n Br. 21, ECF No. 63.) Regardless of whether the allegation in the complaint constitutes an admission, Plaintiff does not maintain that Defendant prices below cost for the mask market as a whole, which the court has determined to be the relevant product market. Neither the Complaint nor the briefing alleges that Defendant's pricing in the overall mask market is below cost; instead, Plaintiff alleges only "below-cost sales to sleep labs." (*Id.*)

Plaintiff's assertion that Defendant could be liable for below-cost pricing to *some* customers is unpersuasive because the cases that Plaintiff cites are neither binding precedent nor relevant on either their facts or analysis of relevant product markets. (*See* Pl. Br. in Opp'n to Def. Mot. for Summ. J. 21-22, ECF No. 63; Def. Reply Br. in Supp. of Def. Mot. for Summ. J. 8 & nn.4-5, ECF No. 66.) For example, Plaintiff's reliance on *C.E. Services, Inc. v. Control Data Corp.* – arguably the most relevant of the cases that Plaintiff cites – is misplaced. In *C.E. Services*, the plaintiff was a computer maintenance company started by former employees of the defendant computer maintenance company. 759 F.2d 1241, 1243 (5th Cir. 1985). The defendant reduced prices for the clients that the plaintiff had taken away, and the plaintiff filed a predatory pricing suit. *Id.* The parties and their competitors were known as "third-party maintenance companies" because they all repaired IBM computers. *Id.* The Fifth Circuit allowed the plaintiff to define the relevant product market to exclude IBM, even though

-17-

the service it provided was identical to those offered by the third-party maintenance companies, because it charged customers a different price and customers did not view third-party companies as substitutes to IBM (or vice versa). *Id.* at 1245-46. The court then reversed summary judgment in part, holding that because the defendant had cut its prices for each client for whom it competed with the plaintiff, the defendant had effectively cut prices for the entire relevant market. *Id.* at 1247. In the instant case, on the other hand, Plaintiff alleges that Defendant reduced prices only to sleep labs. As both parties sell masks and PAPs to customers other than sleep labs, Defendant did not cut their prices in each area of competition with Plaintiff. Accordingly, *C.E. Services* is not persuasive. Thus, as Plaintiff has failed to allege an essential element of a predatory pricing claim, there can be no genuine issue of material fact, and summary judgment is appropriate.

### 2. Dangerous Probability of Recoupment

As the court has held that there is no genuine issue of fact as to whether or not Defendant priced below cost in the relevant market, it is unnecessary to evaluate the second element of a predatory pricing claim and determine whether Defendant has a dangerous possibility of recoupment. *See United States v. AMR Corp.*, 335 F.3d 1109, 1121 (10th Cir. 2003) (holding that where the Plaintiff failed to establish the first prong of the predatory pricing claim, it was unnecessary to discuss the second prong). Therefore, Defendant's motion for summary judgment is granted as to any monopolization, attempted monopolization, or Sherman Act claim based on predatory pricing.

### b. Product Bundling[5]

---

[5]    In its opposition brief, Plaintiff alleges that Defendant is engaged in illegal tying, in addition to bundling. (Pl. Opp'n Br. 14-15, ECF No. 63.) As this allegation does not appear in the Complaint, the court need not address it in evaluating the motion for summary judgment. If Plaintiff had properly alleged tying, the claim would still fail as a matter of law. Tying occurs when a company sells products A

Plaintiff alleges that Defendant engaged in anticompetitive behavior by providing discounts for customers who purchase Respironics PAPs and masks together.  (Pl. Compl. ¶¶ 22-25, ECF No. 1.) Respironics' summary judgment motion argues that such a practice is pro-consumer and does not violate antitrust laws, and that the limited number of cases where courts have held such bundling practices anticompetitive are easily distinguishable on the facts.

The parties discuss only two cases in which courts have found bundling practices to violate the Sherman Act.  *See LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003); *SmithKline Corp. v. Eli Lilly and Co.*, 575 F.2d 1056 (3d Cir. 1978).  Because each of these cases is factually distinguishable from the case at bar, and because the rationale behind the finding of anticompetitive conduct in each case does not apply to the case at bar, the court holds that Plaintiff has failed to create a genuine issue of material fact regarding whether Defendant engaged in anticompetitive bundling.

In *SmithKline*, the parties competed in the market for a class of antibiotics called cephalosporins. 575 F.2d at 1059.  The defendant, Eli Lilly, manufactured five cephalosporin drugs, including the top two sellers.  *Id.*  The plaintiff, SmithKline, entered the market with a generic equivalent to Eli Lilly's

---

and B together, where A is not available in the marketplace unless purchased with B:

> An indispensable element of an unlawful tying arrangement is the seller's conditioning of the availability of product A on the purchase of product B.  *E.g., Eastman Kodak Co.* [*v. Image Tech. Servs.*, 504 U.S. 451, 494-495 (1992)] [parallel citations omitted]; *Northern Pacific Ry. v. United States*, 356 U.S. 1, 6 n.4 [parallel citations omitted] (1958).  Thus, if the tying product may be purchased without also buying the allegedly tied product, there can be no unlawful tying.

*Ortho Diagnostic Sys., Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp. 455, 471 (S.D.N.Y. 1996).  In the instant case, it is undisputed that consumers may purchase PAPs and masks individually; thus, a tying claim fails as a matter of law.

-19-

third-highest selling cephalosporin.  *Id.*  SmithKline's new generic cephalosporin was a serious threat to Eli Lilly; not only was it the generic equivalent to Eli Lilly's third-highest selling drug, but it was also the therapeutic equivalent to Eli Lilly's highest selling cephalosporin, on which Eli Lilly held a complete and legal monopoly due to its patent.  *Id.* at 1061.  In response to the new competition, Eli Lilly adopted a rebate plan that provided a three-percent rebate to hospitals that purchased certain quantities of any three of Eli Lilly's five cephalosporins.  *Id.* at 1060.  The Third Circuit noted the competitive effects on SmithKline:

> To meet the bonus discounts offered by Lilly, a competitor was forced to more than meet the competition on the one [generic] product . . . ; it had to match the bonus rebate awarded to the hospital purchaser based on total purchases of three cephalosporins, including the [two] leading sellers . . . In SmithKline's case, this meant it had to compete "three-on-one." . . . in order to offer a rebate of the same net dollar amount as Lilly's, SmithKline had to offer purchasers of [its generic cephalosporin] rebates of some 16% to hospitals of average size, and 35% to larger volume hospitals.

*Id.* at 1062.  The court went on to conclude that Eli Lilly's willful acquisition and maintenance of monopoly power were caused by anticompetitive conduct: "linking products on which Lilly faced no competition – [its top two sellers] – with a competitive product, [its third-highest seller].  The result was to sell all three products on a non-competitive basis in what would have otherwise been a competitive market for [SmithKline's generic and Eli Lilly's third-highest seller]."  *Id.* at 1065.  In its subsequent bundling opinion in *LePage's*, the Third Circuit explained that "[t]he gravamen of Lilly's § 2 violation was that Lilly linked a product on which it faced competition with products on which it faced no competition."  324 F.3d at 156.

In *LePage's*, defendant 3M held a 90% market share in Scotch-brand tape.  *Id.* at 144.  When plaintiff LePage's gained success by selling private-label tape to Office Depot and Wal-Mart, 3M took

-20-

aggressive steps to gain a competitive advantage in the private-label tape market. *Id.* at 144-45. Among other things, 3M offered rebates to LePage's customers if they met purchasing targets spanning six of 3M's diverse product lines, including health care, retail auto, and home care products. *Id.* at 154. If a customer did not meet purchasing targets in any line, including tape, they would lose the rebate across the line. *Id.* In holding that this behavior was anticompetitive, the Third Circuit noted:

> The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer.

*Id.* at 155. Thus, in *LePage's*, as in *SmithKline*, courts found bundling to be anticompetitive where the bundling defendant reduced prices for a combined bundle of goods that the plaintiff, or any other competitor in the industry, could not produce.

*Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp. 455, 465 (S.D.N.Y. 1996) also demonstrates the significance of an antitrust plaintiff's inability to produce an identical product bundle in evaluating whether bundling is anticompetitive. In *Ortho*, the court granted summary judgment to the defendant Abbott Labs on plaintiff Ortho's claim for anticompetitive bundling. *Id.* Abbott Labs manufactured five blood assays used to screen for viruses. *Id.* at 459. Defendant Ortho manufactured comparable blood assays to only four of the five. *Id.* Abbott Labs offered price discounts to hospitals that purchased all five assays from it, which caused Ortho to lose a significant volume of sales. *Id.* at 460-62. However, Ortho was able to team with another manufacturer to offer a similar discounted bundle of all five blood assays. *Id.* at 461 n.8. Moreover, Ortho's blood assay business was still profitable, even when it matched Abbott Labs' prices. *Id.* at 470. The appellate court found that

because Ortho was able to sell the same bundle as Abbott Labs at the same price, and do so profitably, the bundling was not anticompetitive activity. *Id.* at 470-71.

In the instant case, Defendant bundles its masks and PAPs together for sale to sleep labs. Plaintiff also sells PAPs and masks (*see* ECF No. 61, Ex. 3), and other competitors also bundle PAPs and masks (*see* Aff. of Mark D'Angelo ¶ 16, ECF No. 61, Ex. 1; ECF No. 61, Ex. 2, 4-6). Thus, unlike in *SmithKline* or *LePage's*, Plaintiff manufactures the same products and can match the product bundles offered by Defendant. In *SmithKline* and *LePage's*, the Third Circuit found anticompetitive conduct where a company used products that its competitors could not produce to unfairly subsidize its low prices on products that its competitors were producing and selling. This practice distorted the marketplace for the competitive products. In the instant case, Defendant's bundle does not unfairly distort the marketplace because, just as in *Ortho*, Plaintiff can sell a similar bundle. Plaintiff does not cite any case in which a court has found a bundling practice anticompetitive under facts similar to the instant case.

Plaintiff disputes this interpretation of *SmithKline* and *LePage's*, arguing that the true test of a bundling claim is not whether the parties could offer the same bundle, but rather the exclusionary effects of the bundling on the competition. However, the court's analysis is supported by the Areeda treatise on antitrust law which states, in relevant part:

> In the anticompetitive case, which we presume is in the minority, the defendant rewards the customer for buying its product B rather than the plaintiff's B, not because defendant's B is better or even cheaper. Rather, the customer buys the defendant's B in order to receive a greater discount on A, which the plaintiff does not produce. In that case the rival can compete in B only by giving the customer a price that compensates it for the foregone A discount.

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law*, 749, at 83 (Supp. 2002).  In the instant case, both Plaintiff and Defendant make products A and B (masks and PAPs).  Thus, the anticompetitive case that the treatise anticipates is not present.  A later supplement of the Areeda treatise further acknowledges that bundling in the instant circumstance is not anticompetitive:

> Indeed, unless there is evidence of collusive behavior we would be reluctant to extend the doctrine to any situation in which there was at least one competing firm able to match the defendant's discount across all product lines.

*Id.* at 323 (Supp. 2006).  In the instant case, where there are competing firms that can match the bundle, a finding that Defendant's bundling practice was anticompetitive could end up "requir[ing] businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business."  *Ortho*, 920 F. Supp. at 470.

As the court has found that (1) Defendant did not price its masks below cost in the relevant market, (2) there is no allegation that Defendant's mask-PAP bundles are priced below cost, and (3) Defendant's bundling was not anticompetitive, Plaintiff's allegations of anticompetitive activity are insufficient as a matter of law to support its claims for monopolization, attempted monopolization, and price discrimination.  Accordingly, Defendant's Motion for Summary Judgment (ECF No. 60) is granted as to the monopolization, attempted monopolization, and price discrimination claims.

## B. Restraint of Trade: Sherman Act, § 1

To establish a restraint of trade violation under Section 1 of the Sherman Act, a plaintiff must prove:

> (1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3)

-23-

> within relevant product and geographical markets; (4) that the objects of and
> conduct pursuant to that contract or conspiracy were illegal; and (5) that the
> plaintiff was injured as a proximate result of that conspiracy.

*Int'l Logistics Group*, 884 F.2d at 907.

Plaintiff argues that Defendant's Motion for Summary Judgment does not address this claim specifically, and contends that unlike the previously-discussed claims, this claim alleges multilateral conduct, not solely unilateral conduct.  (Pl. Br. in Opp. 12, ECF No. 63.)  In its reply brief, Defendant posits that this claim alleges the same underlying illegal conduct – predatory pricing and product bundling – as Plaintiff's other claims.  (Def. Reply Br. 15-17, ECF No. 66.)  Defendant contends that because the alleged predatory pricing and product bundling is legal, this claim must also fail.  (*Id.*)

In its Complaint, Plaintiff describes its Section 1 claim as follows:

> 42. Pursuant to its product bundling practices, **Respironics has entered into agreements with Outlets** pursuant to which the Outlets have been forced to purchase Respironics' PAPs in order to make an economically viable purchase of its masks.

> 43. Upon information and belief, **Respironics has agreed with Sleep Labs** to sell products to them at predatorily low prices in exchange for the Sleep Labs' prescribing Respironics' products to the exclusion of others'.

(Pl. Compl. ¶¶ 42-43, ECF No. 1) (emphasis added).  In addition to alleging predatory pricing and product bundling, Plaintiff specifically alleges an agreement between Respironics and Sleep Labs to prescribe Respironics' products to the exclusion of others.  Neither party's briefing addresses whether this activity could be illegal and anticompetitive under the relevant law.  In light of the lack of specific briefing on this claim, Defendant has not met its burden of showing that there is no genuine issue of material fact.  Thus, Defendant's motion for summary judgment (ECF No. 60) is denied as to Plaintiff's Section 1 restraint of trade claim.

## C. Valentine Act

Defendant next moves for summary judgment on Plaintiff's state law claim under O.R.C. §§ 1331.01 and 1331.04 of Ohio's antitrust statute, the Valentine Act. The Valentine Act was patterned after the Sherman Act, "and as a consequence this court has interpreted the statutory language in light of federal construction of the Sherman Act." *C.K. & J.K., Inc. v. Fairview Shopping Center Corp.*, 63 Ohio St. 2d 201, 204 (1980). Accordingly, where a plaintiff's claim under the Sherman Act fails, courts have also held that a plaintiff's Valentine Act claim fails as well. *Richter Concrete Corp. v. Hilltop Basic Res.,* 547 F. Supp. 893, 920 (S.D. Ohio 1981), *aff'd*, 691 F.2d 818 (6th Cir. 1982).

Defendant argues that Plaintiff's Valentine Act claim must fail because it is based entirely on elements that fail under the Sherman Act. (Def. Mem. in Supp. of its Mot. for Summ. J. 24-25, ECF No. 61.) Plaintiff contends that its Valentine Act claim is based on multilateral conduct, in reflection of Section 1 of the Sherman Act, and thus, Defendant has not meaningfully addressed its claim sufficient to warrant summary judgment. (Pl. Br. in Opp. 13, ECF No. 63.) In its reply brief, Defendant erroneously insists that Plaintiff has not "alleged, much less supported with evidence" any multilateral conduct, stating, "Thus, there is no multi-lateral conduct to consider . . . ." (Def. Reply Br. 17, ECF No. 66.) As indicated in the discussion of the restraint of trade claim above, however, Plaintiff has alleged that Respironics entered into agreements with Outlets and Sleep Labs, which constitutes multilateral conduct. (Pl. Compl. ¶¶ 42-44, 52-53, ECF No. 1.) Viewing these facts in Invacare's favor, the court finds that a genuine issue of material fact exists as to whether Defendant's alleged agreements violated § 1331.01 and § 1331.04 of Ohio's Valentine Act. Thus, as the court has denied summary judgment as to Plaintiff's Section 1 Sherman Act claim for restraint of trade, Plaintiff's Valentine Act claim remains, but solely under a restraint of trade theory.

-25-

**D. Unfair Competition**

Defendant seeks summary judgment on Plaintiff's unfair competition claim on the grounds that (1) this claim is based on the same predatory pricing and bundling conduct discussed above and therefore fails along with the above claims, and (2) Plaintiff has not shown evidence that satisfies the elements of the claim. Defendant contends that antitrust allegations do not support an unfair competition claim under Ohio law. (Def. Mem. in Supp. of its Mot. for Summ. J. 25-27, ECF No. 60.) The Ohio Supreme Court has held that

> [u]nfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another. The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another.

*Water Management, Inc. v. Stayanchi,* 15 Ohio St. 3d 83, 85 (Ohio 1984) (internal citations omitted). Plaintiff counters that the above definition is inclusive, and includes unfair commercial practices *such as*, but not limited to, those listed above. Even the broadest reading of the *Water Management* language, however, still bases an unfair competition claim on malicious conduct intentionally directed against another company. Yet Plaintiff alleges that Respironics intended to dominate the market, not that it intended to malign or make misrepresentations about Plaintiff or other companies. (Pl. Compl. ¶¶ 55-56, ECF No. 1.) The court therefore declines to expand *Water Management*'s definition of unfair competition to include the allegations stated in Plaintiff's Complaint.

Plaintiff's citation to *Harco Corp. v. Corrpro Cos.* for the proposition that an unfair competition claim may be based on a violation of the Valentine Act is similarly unavailing. In *Harco*, the Ohio Court of Appeals affirmed a verdict and set of jury instructions that included "a thorough and correct discussion of the Valentine Act" within the definition of unfair competition. 1986 Ohio App. LEXIS

8925, *10 (Ohio Ct. App. Oct. 29, 1986). However, the *Harco* court was evaluating an instruction on unfair competition to determine whether it was actually an improper instruction on malicious prosecution, so the issue of whether antitrust violations could support a claim of unfair competition was not squarely before the court. *Id.* Accordingly, *Harco* does not support Plaintiff's position. Thus, Invacare has not demonstrated, and the case law does not indicate, that an unfair competition claim may stand for an antitrust violation.

This conclusion is supported by *Defiance Hospital v. Fauster-Cameron, Inc.*, wherein a hospital and medical services provider sued a clinic operator and its employees for monopolizing the anesthesia services market. The plaintiffs asserted Sherman Act and the Valentine Act claims, unfair competition, and other claims. The *Defiance* court found:

> Although plaintiffs have styled [the unfair competition claim] as a separate claim, plaintiffs do not point to any particular cause of action and cite no cases in support of their contention that this claim should survive summary judgment. I find the wrongful acts and anticompetitive behavior alleged in this count to be evidence in support of [Plaintiff's] antitrust claims, rather than proof of an independent actionable tort.

344 F. Supp 2d 1097, 1117-1118 (N.D. Ohio 2004). Similarly, Plaintiff cites the same predatory pricing and bundling activity for its antitrust claims as for its unfair competition claim. As Plaintiff has not alleged conduct that meets any accepted or anticipated definition of unfair competition, the court grants Defendant's motion for summary judgment (ECF No. 60) as to Plaintiff's unfair competition claim.

### E. Rule 56(f) Motion

Plaintiff's Rule 56(f) motion asserts that

> the discovery period in this action is only beginning, and Invacare has had no opportunity to gather the evidence – let alone subject the evidence to expert analysis – that will allow it to prove important

-27-

components of antitrust claims such as relevant markets, market
power, below-cost predatory pricing, and exclusionary effects.

(Pl. Mot. Pursuant to Rule 56(f) 1, ECF No. 62-1.)  The accompanying affidavit by Plaintiff's

counsel lists a number of people Plaintiff wishes to depose and facts and documents it wishes to

gather.  (Aff. of John Eklund, ECF No. 62-2, Ex. A.)  While it is true that pre-discovery dismissals

in antitrust cases should be granted sparingly, *Hosp. Bldg. Co.,* 425 U.S. at 746, courts in the Sixth

Circuit have denied Rule 56(f) motions and granted summary judgment in antitrust cases.  *See, e.g.*,

*E. Ky. Cardiothoracic Surgery, P.S.C. v. Ashland Hosp. Corp.*, 119 Fed. Appx. 715 (6th Cir. Dec.

21, 2004); *Nilavar v. Mercy Health System-Western Ohio*, 2005 U.S. Dist. LEXIS 13417, *69 (S.D.

Ohio July 5, 2005).  As discussed in Section II.B, *supra*, to succeed on a Rule 56(f) motion, Plaintiff

must demonstrate that further discovery would raise a genuine issue of material fact sufficient to

defeat Defendant's motion for summary judgment.

> *Nilavar*, in its denial of a Rule 56(f) motion, is particularly apt to the instant case:

>> In view of the fact that summary judgment is proper with respect to
>> Plaintiff's antitrust claims *because of his failure to present viable evidence*
>> *with respect to alleged market conditions*, among other reasons, the Court
>> disagrees that further discovery on this issues [sic] identified by Plaintiff
>> would aid his opposition to Defendants' motion for summary judgment.
>> Plaintiff has not identified any prospective discovery that bears on the
>> issue of geographic market definition that would benefit from a
>> postponement under Rule 56(f).  Regardless of whether further discovery
>> might aid Plaintiff in raising a genuine issue of material fact on the other
>> bases on which Defendants seek summary judgment on Plaintiff's antitrust
>> claims, the Motion for Summary Judgment on those claims would remain
>> well taken, on the basis of his failure to create a genuine issue of material
>> fact on the issue of the relevant geographic market.

2005 U.S. Dist. LEXIS 13417 at *69 (emphasis added).  Similarly, in the instant case, Plaintiff's

failure to create a genuine issue of material fact regarding the relevant product market definition

renders any other discovery moot.  That is, Plaintiff has failed to persuade the court to adopt its

-28-

narrow submarket definition of "masks sold to sleep labs," and Plaintiff cannot support its claims in the relevant market of "masks for use with PAPs" in the United States.

No amount of discovery will change the fact that the masks sold to sleep labs and DMEs are the same product, nor will discovery into bundling practices change the fact that other companies are able to produce the same bundle as Respironics. These practices are not legally anticompetitive, and therefore no genuine issue of fact exists to preclude summary judgment. Although Plaintiff seeks discovery on the price-cost relationship for masks and PAPs, such discovery is immaterial as Plaintiff has not alleged that price is lower than cost in the overall mask market. Likewise, Plaintiff seeks information on what products other than masks Defendant has sacrificed profits in order to disadvantage competition; however, Plaintiff has not asserted any specific additional allegations to support this discovery. Finally, as Plaintiff has failed to satisfy the first prong of a predatory pricing claim, discovery into recoupment of losses (the second prong) is likewise moot. Accordingly, Plaintiff's Rule 56(f) Motion (ECF No. 62) is denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 60) is granted in part and denied in part and Plaintiff's Rule 56(f) Motion (ECF No. 62) is denied. Plaintiff's claims under Section 1 of the Sherman Act and Ohio's Valentine Act remain. The parties shall proceed with

discovery as to these claims.  The court will determine, after a discussion with the parties, the appropriate discovery cut-off date as well as a cut-off date for filing dispositive motions.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*

UNITED STATES DISTRICT JUDGE

October 23, 2006