UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| INVACARE CORPORATION, | ) | Case No.: 1:04 CV 1580 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| RESPIRONICS, INC., | ) | |
| | ) | |
| Defendant | ) | ORDER |

Plaintiff Invacare Corporation ("Plaintiff" or "Invacare") and Defendant Respironics, Inc.
("Defendant" or "Respironics")[1] manufacture and distribute positive airway pressure devices ("PAPs")
and masks used to treat obstructive sleep apnea ("OSA"), a condition in which a person's airway closes
during sleep.  Plaintiff filed the above-captioned lawsuit, alleging that Defendant violated various
antitrust laws related to Defendant's manufacture of PAPs and masks.  Now pending before the court
is Defendant's Motion for Summary Judgment as to Remaining Claims.  (ECF No. 94.)  For the reasons
discussed below, Defendant's Motion is granted.

## I.  FACTS AND PROCEDURAL HISTORY[2]

---

[1]     On March 19, 2008, Defendant filed a Supplemental Corporate Disclosure
Statement, which indicated that "Koninklijke Philips Electronics NV . . . has
recently acquired all of the stock in Respironics, Inc."  (ECF No. 105.)

[2]     The court's previous Order contains a more detailed discussion of the facts.
(Order, ECF No. 80, at 1-3.)

In March, 2004, Respironics sued Invacare in the Western District of Pennsylvania, alleging patent infringement.  (Def.'s W.D. Pa. Compl., ECF No. 17, Ex. A.)  The parties have not informed the court regarding whether that lawsuit is still pending.  In August, 2004, Invacare filed the instant case against Respironics in this court, alleging the following claims: (1) monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization, in violation of Section 2 of the Sherman Act; (3) restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (4) price discrimination, in violation of Section 2 of the Clayton Act, 15 U.S.C. § 13(a); (5) violations of the Valentine Act, O.R.C. §§ 1331.01, 1331.04; and (6) unfair competition.  (Pl.'s Compl., ECF No. 1.)

On October 23, 2006, the court granted partial summary judgment for Defendant on several of Plaintiff's claims.  (Order, ECF No. 80.)  On July 19, 2007, the court denied Plaintiff's Motion for Reconsideration.  (Order, ECF No. 104.)  Consequently, Plaintiff's only remaining claims are for restraint of trade under both the Sherman Act and Ohio's Valentine Act.[3]  Plaintiff's restraint of trade claims allege:

> 42. Pursuant to its product bundling practices, Respironics has entered into agreements with Outlets pursuant to which the Outlets have been forced to purchase Respironics' PAPs in order to make an economically viable purchase of its masks.
>
> 43. Upon information and belief, Respironics has agreed with Sleep Labs to sell products to them at predatorily low prices in exchange for the Sleep Labs' prescribing Respironics' products to the exclusion of others'.
>
> 44. Each of those agreements unreasonably restrains trade and commerce by foreclosing other competitors from access to the relevant markets and

---

[3]  In its October 23, 2006 Order, the court allowed the parties to engage in additional limited discovery regarding the restraint of trade claims.  (Order, ECF No. 80, at 29-30.)

> denying the Outlets the benefits of a competitive market. These agreements have allowed Respironics to charge prices that are above competitive levels, to reap super-competitive profits and to exclude competition from those markets. It has been able to do so because it has substantial market power in the relevant markets . . . , and there are no aspects of these agreements that enhance or promote competition.

(Pl.'s Compl. ¶¶ 42-44) (emphasis added).

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*,

863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id.*

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

In antitrust cases, summary judgment is appropriate if the claim "simply makes no economic sense." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992).  While it is true that "[i]n antitrust litigation, summary judgment is particularly disfavored and the standard for granting summary judgment is strict," *Hand v. Cent. Transport., Inc.*, 779 F.2d 8, 10 (6th Cir. 1985), unsupportable antitrust claims are susceptible to summary judgment under the standards outlined above. *See, e.g.*, *Eastman Kodak Co.*, 504 U.S. at 451; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 574 (1986); *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 946 (6th Cir. 2005). However, the Supreme Court also cautioned that courts should "resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" *Eastman Kodak Co.*, 504 U.S. at 467 (quoting *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579 (1925)).

### III.    LAW AND ANALYSIS

The parties do not dispute that a restraint of trade claim under Ohio's Valentine Act is subject to the same analysis as a restraint of trade claim under the Sherman Act.  *See Richter Concrete Corp.*

*v. Hilltop Basic Res.*, 547 F. Supp. 893, 920 (S.D. Ohio 1981); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980).  Therefore, the court will discuss Plaintiff's restraint of trade claims under federal and state law together.

### A. Overview of Applicable Law

Section 1 of the Sherman Act prohibits "every contract, combination . . ., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1; *see Care Heating & Cooling, Inc. v. Am. Std., Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005).  In *Care Heating & Cooling*, the Sixth Circuit noted that the Supreme Court has recognized that "nearly every contract binding parties to an agreed course of conduct amounts to some sort of 'restraint of trade' . . . [and, consequently,] the Supreme Court has limited the restrictions of section 1 to bar only 'unreasonable restraints.'"  427 F.3d at 1012 (quotation omitted).

In the instant case, Plaintiff alleges a vertical restraint.  The Sixth Circuit has defined a vertical restraint as "involv[ing] agreements among actors at different levels of market structure to restrain trade, 'such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market.'"  *Id.* at 1013 (quoting *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)).  The Sixth Circuit has described vertical restraints as "generally represent[ing] a less apparent threat to competition [than horizontal restraints]."  *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 344 (6th Cir. 2006).

The "rule of reason" applies to allegations of vertical restraints.  *Care Heating & Cooling*, 427 F.3d at 1013.  To establish a prima facie case under the rule of reason, a plaintiff must prove:

> (1) that the defendants contracted, combined, or conspired; (2) that the scheme produced anticompetitive effects; (3) that the restraint affected relevant product and geographic markets; (4) that the object of the scheme and the conduct resulting from it was illegal; and (5) that the scheme was a proximate cause of the plaintiff's antitrust injury.

-5-

*Expert Masonry*, 440 F.3d at 343 (citations omitted).  If the plaintiff meets its prima facie case, the burden then shifts to the defendant to "come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitive injuries." *Id.* (quoting *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003)).  If the defendant meets its burden, the plaintiff must then show that "any legitimate objectives can be achieved in a substantially less restrictive manner." *Id.* (quoting *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 718).

A plaintiff may demonstrate an antitrust conspiracy through either direct or circumstantial evidence. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) (reversing summary judgment in a horizontal restraint case where the plaintiff showed circumstantial evidence of a conspiracy).  When analyzing whether circumstantial evidence demonstrates an antitrust conspiracy, the court must consider:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire.

*Re/Max*, 173 F.3d at 1009.  The Sixth Circuit has held that "[o]rdinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct." *Id.*  In analyzing circumstantial evidence, the Supreme Court has held that

> conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.  To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.

-6-

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quotations omitted and emphasis added).  The Court recently reiterated this standard, stating that "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently . . . ."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) (citing *Matsushita*, 475 U.S. 574).

The Sixth Circuit has created the following two-part analysis in applying this standard to a Section 1 Sherman Act claim:

> (1) Is the plaintiff's evidence of conspiracy ambiguous, *i.e.*, is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1168 (6th Cir. 1995) (quoting *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 483 (6th Cir. 1990)).

Plaintiff alleges that Defendant entered into agreements with sleep labs (Compl. ¶ 42) and with durable medical equipment suppliers ("DMEs") and/or outlets[4] (*id.* ¶ 43).  The court will discuss each allegation in turn.

### B. Agreements with Sleep Labs

### 1. Existence of Agreements

As stated above, paragraph 43 of Plaintiff's Complaint alleges that Respironics and sleep labs entered into agreements by which sleep labs "prescrib[ed] Respironics' products to the exclusion of

---

[4]     Both parties appear to use the terms "DMEs" and "outlets" interchangeably.

others'."[5]  In its Motion, Defendant relies on the fact that Plaintiff's Rule 30(b)(6) witness, J.B. Richey ("Richey"), testified that he had no knowledge of any agreements between Respironics and sleep labs to prescribe Respironics' products.  However, the parties stipulated that Richey would not testify regarding facts or evidence designated "attorney's eyes only" under the parties' Stipulated Protective Order.  (*See* Dep. of J.B. Richey ("Richey Dep.") 7-8, Pl.'s Ex. D, ECF No. 98; Stipulated Protective Order, ECF No. 33.)  Consequently, Plaintiff contends that Richey's testimony is of limited value. However, Plaintiff argues that "attorney's eyes only" evidence, which it produced in support of its opposition to summary judgment, demonstrates the existence of the alleged agreements.  In light of Plaintiff's argument, the court concludes that it should not limit itself to the deposition testimony of Richey regarding agreements between Respironics and sleep labs and DMEs.  Accordingly, the court will consider all of the evidence that Plaintiff presents in opposition to Defendant's Motion for Summary Judgment.

It is undisputed that Plaintiff presents only circumstantial evidence of agreements with sleep labs.  As discussed below, the court finds that each of the actions that Plaintiff points to as evidence of an antitrust conspiracy is equally consistent with Defendant's economic self-interest as it is with an illegal conspiracy.

*a. Free Masks*

Plaintiff points out, and Defendant does not dispute, that Respironics gave away an estimated 591,254 free masks to sleep labs from 2000 to 2004, under a "Mask Maintenance Program."  According

---

[5]     Plaintiff also alleges that, pursuant to the agreements, Respironics agreed to sell products to sleep labs at predatorily low prices.  However, the court has previously found that Respironics did not engage in predatory pricing.  (Order, ECF No. 80, at 16-18.)

to one of Defendant's witnesses, this practice cost Respironics approximately $1.5 million.  Respironics' internal sales training materials indicate that Respironics' goal in giving away free masks to sleep labs was to obtain brand-specific prescriptions for its masks and PAPs.  (*See* Pl.'s Ex. H-1 at RI026354, ECF No. 99; Pl.'s Ex. H-16 at RI071853, ECF No. 99.)   Plaintiff also cites Respironics' material that announces a strategy to "[k]eep customers from seeking competitive alternatives." (Pl.'s Ex. H-14, ECF No. 99.)   Despite Plaintiff's contention otherwise, the court finds that these documents merely demonstrate permissible internal company goals and do not, by themselves, indicate a conspiracy with sleep labs.

Respironics provided evidence that the practice of providing free masks to sleep labs furthers its legitimate business purpose of making its product available so as to encourage sleep lab technicians to use Defendant's masks on patients and increase patients' comfort with the products, thereby hopefully leading physicians to prescribe Respironics' products for their patients.  (*See* Dep. of Laurie Scott ("Scott Dep.") 55-58, Pl.'s Ex. E, ECF No. 98.)   The fact that Respironics provided several other benefits to sleep labs – such as mask-fitting workshops, information comparing Respironics' products to its competitors' products, and instruction on cleaning and sterilizing products (Pl.'s Ex. H-1, ECF No. 99) – supports Defendant's argument that the free masks were part of an overall strategy to make sleep lab technicians and patients familiar and comfortable with their products in order to encourage Respironics-brand prescriptions.

Plaintiff contends that the practice of giving away free masks is against Respironics' economic self-interest because Respironics could have achieved the same results by *selling* their masks to sleep labs.  The court disagrees.  The fact that some sleep labs received free masks from multiple companies at the same time conflicts with Plaintiff's argument that the reason that sleep labs received Respironics'

masks was due to agreements with Respironics.  (*See* Dep. of Rhonda Gillette 170, Def.'s Ex. 2; Dep. of McVeigh 99, Def.'s Ex. 3, ECF No. 95.)  Furthermore, Invacare admitted that Invacare itself has provided either free or below cost masks to sleep labs, DMEs, or customers.  (Invacare Corp.'s Answers & Objs. to Respironics, Inc's First Set of Interrogs. ("Invacare's Answers to Interrogs.") No. 6, Def.'s Ex. 9, ECF No. 95.)[6]

Therefore, based on the evidence, the court finds that Respironics' practice of providing free masks to sleep labs is consistent with legitimate business interests and its economic self-interest.   As Defendant argues, none of Plaintiff's evidence suggests that providing free masks to sleep labs would have been uneconomical unless sleep labs had agreed to prescribe only Respironics' products.  Consequently, the free masks do not provide circumstantial evidence of exclusive agreements with sleep labs to prescribe Respironics' products.

*b. Prescription Pads*

Another practice that Plaintiff points to as circumstantial evidence of agreements with sleep labs is that Respironics does not dispute that it provided prescription pads that were preprinted with Respironics' products to any sleep lab that wanted them.  (Scott Dep. at 71-72.)  A Respironics employee testified that the advantage of the preprinted pads was that if a sleep lab wanted to prescribe a certain product, it was easier to check a box than to write out a prescription.  (*Id.* at 72.)  However,

---

[6]     Plaintiff also argues that giving away free masks may violate that Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and that if it does, this provides additional evidence that the activity constitutes an antitrust conspiracy.  In support of this proposition, Plaintiff cites *Transnor (Bermuda), Ltd. v. BP North Am. Petroleum*, 738 F. Supp. 1497, 1498-1499 (S.D.N.Y. 1990), which held that evidence that a defendant's activity violated a non-antitrust law was relevant to whether it violated antitrust law.  As Plaintiff has failed to show that giving away free masks actually violates the Federal Anti-Kickback Statute, Plaintiff's argument is not well-taken.

Plaintiff provides no evidence or argument that the practice of providing preprinted prescription pads led any sleep labs to prescribe Respironics' products exclusively or that any prescription of a Respironics' product was pursuant to an agreement with Respironics, rather than pursuant to an independent decision made by the sleep lab or physician.  As such, the court finds that Plaintiff has not created a genuine issue of material fact that the preprinted prescription pads were inconsistent with independent conduct.

### c.  *Power Programs for Sleep Professionals*

Plaintiff argues that Respironics' implementation in 2001 or 2002 of "Power Programs for Sleep Professionals" evidences agreements between Defendant and sleep labs for Respironics-brand prescriptions.  Through the Power Programs for Sleep Professionals, Respironics provided certain sleep labs with resources and tools, on a trial basis, to help identify new patients.  (Dep. of Nancy Nicoll ("Nicoll Dep.") 47, Pl.'s Ex. J, ECF No. 100.)  The Power Programs for Sleep Professionals also involved selling some materials to the sleep labs that enrolled in the program.  (Frank Dep. at 150.)  Respironics identified sleep labs that wanted to grow their business and in which the market conditions would allow Respironics to capture "a majority of the downstream business."  (*Id.* at 51.)  Construing the facts in Plaintiff's favor, Respironics' sales employees specifically targeted those sleep labs that would likely garner Respironics a large percentage of the therapeutic business for enrollment in the Power Programs for Sleep Professionals.  (*Id.* at 50-53.)

Plaintiff provides isolated instances of purported agreements.  For example, Nancy Nicoll ("Nicoll"), a Respironics employee, testified that some sleep labs, upon enrolling in the Power Programs for Sleep Professionals, told Respironics' sales staff that they would make referrals for Respironics' products.  (*Id.* at 54-61.)  However, in the same testimony, Nicoll stated that these statements by sleep

-11-

labs were often by account managers expressing "enthusiasm" and that she could not recall any of the conversations specifically.  (*Id.* at 54.)  Nicoll also testified repeatedly that the Power Programs for Sleep Professionals were specifically designed *not* to be agreements.  She further stated that the sleep labs did not have to commit a certain percentage of their purchases to Respironics.  (*Id.* at 46-47, 192-94.)  Her testimony is not contradicted by any evidence provided by Plaintiff.

Plaintiff provides one e-mail from a Respironics' sales employee requesting to enroll a company in the Power Program for Sleep Professionals because the owner "committed . . . that if [Respironics] grow[s] his diagnostic business, he will support [Respironics] more aggressively on the therapy business." (Pl.'s Ex. H-7 at 2, ECF No. 99.)  The Respironics' employee stated in the e-mail that "[o]ur goal is to grow the referrals to his testing beds and leverage our relationship to gain the majority share of therapy business. . . . I feel that if we leverage our support and become better business partners we will have an opportunity to strategicly [sic] participate in the development of his home care business and position Respironics as the equipment of choice." (*Id.*)  Construing the facts in Plaintiff's favor, the court finds that nothing in the language of this e-mail suggests that this owner intended to enter an exclusive agreement with Respironics to prescribe only Respironics-brand products.

Therefore, the court finds that Plaintiff has not provided evidence to create a genuine issue of material fact as to whether Power Programs for Sleep Professionals evidenced exclusive agreements between Respironics and sleep labs to prescribe only Respironics-brand products.

### d. Other Possible Evidence of Agreements

The other evidence on which Plaintiff relies in support of its sleep labs claim is similarly unpersuasive.  For example, Plaintiff offers evidence that DMEs sometimes filled a brand-specific prescription with a different brand instead of honoring the prescription as written.  Plaintiff maintains

-12-

that when Respironics received complaints from physicians about DMEs not filling brand-specific prescriptions as written, Respironics' employees sometimes directed the physician or sleep lab to a DME that would honor their brand-specific prescriptions.  (Nicoll Dep. at 83-85, 215-16; Dep. of John Frank ("Frank Dep.") 76-81, Pl.'s Ex. F, ECF No. 98.)  Plaintiff argues that switching DMEs was a way to "enforce brand-specific prescriptions" and, as such, provides evidence of a conspiracy.  However, the court finds that Respironics' conduct is equally consistent with the legitimate business purpose of directing customers to a DME that would honor a prescription that the customer wanted.  This would also hopefully ensure that Respironics-brand prescriptions would be filled with Respironics' products.  Plaintiff provides no evidence that such conduct is against Respironics' economic self-interest or that Defendant would not have taken this action in the absence of exclusive agreements with sleep labs.

Plaintiff also cites an e-mail between Respironics' employees regarding a physician at a DME who was devoted to Respironics' products and who "believe[d] in the whole idea of if I buy from you [w]hat can you do for me . . . ."  (Pl.'s Ex. H-8.)  However, as the physician worked at a DME, the court finds that the evidence is irrelevant to the restraint of trade claim based on agreements with sleep labs.

Finally, Plaintiff cites one Respironics salesman's monthly report, which indicated that a physician at a sleep lab had agreed to prescribe Respironics' products.  The report stated:

> Met w/ . . . sleep physician . . . . [who] used to leave the particular CPAP equipment to the DME.  As of 9/17, [the physician] has the Encore Pro Software and a smartcard reader.  As a result, he agreed to specify REMSTAR Pro CPAP machines.  Potential upside=40/month.

(Pl.'s Ex. M, ECF No. 100.)  This language, by itself, does not evidence an exclusive agreement between Respironics and a sleep lab.  The language does not state that Respironics gave the physician the software and smartcard reader in exchange for a promise to prescribe Respironics-brand PAPs.  Consequently, this evidence does not tend to exclude the possibility that the physician independently

decided to prescribe Defendant's product.  For the same reasons, the rest of the salesman's report similarly fails to provide any inference of an antitrust conspiracy.

The court finds that, construing all facts in Plaintiff's favor, Plaintiff has not presented sufficient evidence to create a genuine issue of material fact as to whether Respironics entered into agreements with sleep labs to prescribe only Respironics-brand products.  Accordingly, Plaintiff has failed to prove the first prong of the prima facie case under the rule of reason analysis.  Therefore, Plaintiff's federal and state restraint of trade claims based on agreements with sleep labs must fail.  However, for the sake of completeness, the court will also address Defendant's argument that Plaintiff cannot show that Defendant's actions had an adverse effect on competition.

## 2. Foreclosure/Anticompetitive Effects

Even assuming, *arguendo*, that Plaintiff can prove the existence of exclusive agreements between Respironics and sleep labs for Respironics-brand prescriptions, Plaintiff must then prove that these agreements "had an actual adverse effect on competition as a whole in the relevant market."  *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, Nos. 1:01-cv-704, 1:03-cv-781, 2005 U.S. Dist. LEXIS 11676, at *23 (S.D. Ohio June 13, 2005), *aff'd on other grounds*, *J.B.D.L. Corp. v. Wyeth-Ayerst Labs*., 485 F.3d 880 (6th Cir. 2007) (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995)) (internal quotation marks omitted).  This requirement encompasses the second and third prongs of the prima facie case under the rule of reason: "(2) that the scheme produced anticompetitive effects; and (3) that the restraint affected relevant product and geographic markets."  *Expert Masonry*, 440 F.3d at 343; *see J.B.D.L. Corp.*, Nos. 1:01-cv-704, 1:03-cv-781, 2005 U.S. Dist. LEXIS 11676, at *30.  In the instant case, the court determined the relevant markets in its previous Order on summary judgment.  (Order, ECF No. 80, at 8-13.)  Consequently, Plaintiff must prove that Defendant's alleged

-14-

agreements with sleep labs created anticompetitive effects in the U.S. markets for (1) all masks sold to both sleep labs and DMEs and (2) all PAPs sold to both sleep labs and DMEs.

Defendant argues that Plaintiff must show that approximately 40% of the relevant market was "foreclosed" due to Defendant's alleged exclusive agreements with sleep labs.  In the instant case, Nicoll testified that approximately 3,075 sleep labs existed during the relevant time period.  (Nicoll Dep. at 241-42.)  Consequently, according to Defendant's argument, Plaintiff must show evidence that approximately 1,200 sleep labs agreed to fill prescriptions for Respironics' masks exclusively.  The court notes that most of the cases on which Defendant relies for the proposition that a plaintiff must show that a defendant foreclosed 40% of the relevant market do not involve a claim under Section 1 of the Sherman Act.  However, *United States v. Microsoft Corp.*, Nos. 98-1232, 98-1233, 1998 U.S. Dist. LEXIS 14231, 61-62 (D.D.C. Sept. 14, 1998), is on point.  In that case, the court held:

> plaintiffs must establish foreclosure on the order of greater than 40% to prevail on their exclusive dealing claims.  *See, e.g.*, *United States v. Dairymen, Inc.*, 758 F.2d 654 (6th Cir. 1985) (unpublished) (50% sufficient); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1212-14 (W.D.N.C. 1989) (40% insufficient); *Oltz v. St. Peter's Community Hosp.*, 656 F. Supp. 760 (D. Mont. 1987) (84% sufficient).

*Id.* (denying summary judgment on restraint of trade claim).  Defendant also cites *J.B.D.L. Corp.*, in which the court held that a plaintiff alleging a restraint of trade based on exclusive dealing must establish that the defendant's conduct "substantially foreclosed actual competition in the relevant market."  *J.B.D.L. Corp.*, Nos. 1:01-cv-704, 1:03-cv-781, 2005 U.S. Dist. LEXIS 11676, at *30 (emphasis omitted).  In *J.B.D.L. Corp.*, the court granted summary judgment for the defendant, finding that the plaintiff's showing of foreclosure was so inadequate that the court need not determine the specific, appropriate measure of foreclosure.

-15-

Despite the fact that Plaintiff's Complaint specifically asserts that the alleged agreements "foreclos[ed] other competitors from access to the relevant markets," Plaintiff does not expressly address foreclosure on summary judgment. Defendant contends that the failure to address foreclosure is fatal to Plaintiff's case. In light of the fact that Plaintiff argues, in detail, that Defendant's conduct had anticompetitive effects, the court disagrees. However, as discussed below, the court finds that Plaintiff fails to make a showing either that Respironics foreclosed the market or that it caused any other anticompetitive effects. Furthermore, Plaintiff fails to argue anticompetitive effects in the separate relevant markets for masks and PAPs.

One way that a plaintiff can show anticompetitive effects is to demonstrate that the defendant's conduct "foreclosed competitors from gaining a foothold in the market." *See J.B.D.L. Corp.*, Nos. 1:01-cv-704, 1:03-cv-781, 2005 U.S. Dist. LEXIS 11676, at *29 (quotation marks and citations omitted). Here, numerous competitors besides the parties have gained a foothold in the relevant market. Although the parties have not conducted discovery regarding Respironics' market share, Plaintiff has submitted evidence demonstrating the market shares of various Respironics' competitors. The record indicates that, in 2001, the competitors' market shares of the OSA market were: ResMed (32%), MNPB (8%), SleepNet (1%), AirSep (0.3%), and Invacare (0.25%). (Pl.'s Ex. H-11 at RI030474, ECF No. 99; Pl.'s Ex. H-12 at RI03017B, ECF No. 99.) In addition to these companies, Plaintiff admits that several other companies manufacture sleep apnea products in the United States, such as Fisher&Paykel, Mallinkrodt/Tyco, DeVilbiss, VIASYS Healthcare, InnoMed Technologies, and Tiara Medical Systems. (Invacare's Answers to Interrogs. No. 3.) Consequently, the court finds that the evidence shows that a number of companies compete in the OSA field, and that two companies other than Respironics enjoy

-16-

significant shares of the market.  Therefore, the fact that other companies have gained a foothold in the relevant market weighs against a finding of anticompetitive effects.

Plaintiff also cannot show anticompetitive effects for the conduct that it alleged evidenced agreements.  For example, Plaintiff does not dispute that the Power Programs for Sleep Professionals involved only 100 to 150 sleep labs out of approximately 3,075 total sleep labs.  (Nicoll Dep. at 241-42.) That equals a percentage range of 3.25% to 4.88% – much to small to show foreclosure and an insignificant amount by any measure.  Similarly, Plaintiff provides no evidence of how many preprinted prescription pads were given to sleep labs, how many pads were used to prescribe Respironics' products, or that the pads in any way increased prescriptions of Respironics' masks or PAPs.  Plaintiff cites a Respironics "product strategy brief" that states that "[s]leep doctors in labs write brand-specific mask prescriptions 50-60% of the time."[7]  (Pl.'s Ex. H-13, ECF No. 99.)  However, Plaintiff offers no evidence that any of these prescriptions were *Respironics*-brand specific.

Plaintiff also relies on a survey, purportedly conducted by Respironics' sales representatives in 2002, of a few dozen sleep labs, to argue that 87% of responding sleep labs that received free Respironics' masks prescribed Respironics' masks.  (*See* Pl.'s Ex. I, ECF No. 100.)  However, this survey is insufficient to provide evidence of anticompetitive effects.  First, the reliability of the survey is questionable because there are three different survey formats provided and no explanation is given as to how or why the sleep labs surveyed were identified and whether they are representative of all sleep

---

[7]     Defendant argues that Plaintiff's restraint of trade claims are based on an incorrect premise because physicians write out prescriptions, not sleep labs, as Plaintiff's Complaint contends.  However, the above-quoted statement from Respironics' corporate materials and similar statements by Respironics' witnesses refer either to sleep labs, or doctors at sleep labs, prescribing masks.  Therefore, the court will disregard this argument by Defendant.

labs.  Defendant contends that the responding sleep labs are "inherently self-selected as familiar to Respironics."  (Def.'s Reply 17, ECF No. 101.)  Furthermore, the survey data does not support Plaintiff's conclusions.  The court notes that in the two formats for which numbers are provided, the vast majority of surveyed sleep labs indicated that they prescribed brand-specific masks for either no company or for more than one company.  Clearly, these sleep labs do not prescribe Respironics' products exclusively.  The court found only two surveyed sleep labs that listed the percentages of brand-specific masks that they prescribed to each company, and neither of these sleep labs listed Respironics as 100%.  (*See* Pl.'s Ex. I at RI073643, RI073647.)  Also, only a small percentage of surveyed sleep labs listed Respironics as the only company whose brand they prescribe.  Therefore, the survey does not indicate that any alleged agreements between Respironics and sleep labs adversely affected competition as a whole in the relevant market.

In addition, courts have held that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern" because "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition any part of the relevant market." *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-1163 (9th Cir. 1997).  In the case of such agreements, a plaintiff must show a "higher standard of proof of substantial foreclosure."  *Id.* at 1163 (quoting *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1235 (8th Cir. 1987)) (internal quotations omitted).  Here, even assuming that numerous sleep labs have agreed to prescribe only Respironics' products, Plaintiff has not shown that consumers are unable to purchase masks and PAPs from other channels.

-18-

For these reasons, Plaintiff has failed to show that agreements between Respironics and sleep labs foreclosed competition or caused other anticompetitive effects in the relevant markets.  Therefore, the court grants summary judgment to Defendant on Plaintiff's federal and state restraint of trade claims based on agreements with sleep labs.

### C. Agreements with DMEs and/or Outlets

As set forth previously, paragraph 42 of Plaintiff's Complaint alleges that Defendant entered into agreements with DMEs and/or outlets, as follows:

> 42. Pursuant to its product bundling practices, Respironics has entered into agreements with Outlets pursuant to which the Outlets have been forced to purchase Respironics' PAPs in order to make an economically viable purchase of its masks.

The court has previously held that Defendant's bundling did not constitute an anticompetitive practice.  (*See* Order, ECF No 80, at 18-23.)  Defendant contends that the court's dismissal of Plaintiff's bundling claim necessarily warrants dismissal of Plaintiff's restraint of trade claims relating to agreements with DMEs and/or outlets.

Plaintiff does not contest the fact that the bundling claim no longer exists, but argues that there is evidence that agreements between Respironics and DMEs and/or outlets restrained trade by locking in business and foreclosing competitors from entering the sleep mask market.  Plaintiff points to the fact that Defendant implemented Power Programs for Providers, by which DMEs and/or outlets promised to commit a certain portion of their business to Respironics in exchange for a rebate on its purchases.  Plaintiff submits direct evidence of two such agreements: one in which a provider promised to purchase 100% of its sleep disorder products from Defendant (Pl.'s Ex. H-9) and one in which a provider promised 90% (Pl.'s Ex. H-10).  Both agreements entitled the providers to a 4% rebate on Respironics' products.  Plaintiff argues that the purpose of the Power Programs for Providers was for Defendant to

-19-

lock in business, and that these agreements succeeded in excluding competition.  As evidence that these agreements caused negative effects on competition, Plaintiff cites statements from Defendant's annual reports that attributed part of Respironics' success to Power Programs.  The 2002 Annual Report states that "[a]cquisitions, product development and our Power Programs$^{TM}$ clearly strengthened our strategic position."  (Pl.'s Ex. P at 3, ECF No. 100.)  The 2003 Annual Report states that

> much of our continued success [is attributable] to our customer-oriented approach to business.  Four years ago, Respironics committed itself to addressing the needs of its customers through Power Programs$^{TM}$ – a solutions-based marketing strategy designed to help our customers grow their businesses, increase efficiencies and improve patient outcomes.  This program-approach offered healthcare professionals worldwide supplemental tools to improve patient compliance and helped to establish Respironics as a resource for, not only innovative products, but also unique services.
>      . . . . Since the launch of our Power Programs strategy, Respironics' success continues to expand both domestically and abroad.

(Pl.'s Ex. O at 3, ECF No. 100.)  It is unclear whether the reports reference Power Programs for Providers or Power Programs for Sleep Professionals – or both.

The court finds that Plaintiff's federal and state restraint of trade claims based on DMEs and/or outlets do not survive summary judgment for two reasons.  First, Plaintiff's characterization on summary judgment of this claim bears little, if any, resemblance to the claim pled in its Complaint.  The Complaint alleges that Respironics' agreements with outlets forced the outlets to purchase Respironics' PAPs in order to purchase masks at an economically viable price, due to Respironics' bundling practices.  On summary judgment, however, Plaintiff argues that Respironics' Power Programs for Providers with outlets locked in business and foreclosed competitors from entering the sleep mask market.  Therefore, the claim against DMEs and/or outlets that Plaintiff pursues on summary judgment is not properly pled.    Second, even if the claim were properly pled, it fails on the merits.  Plaintiff has

-20-

shown evidence of only two isolated agreements between Respironics and DMEs or outlets. Furthermore, Plaintiff has not presented sufficient evidence to demonstrate foreclosure or other anticompetitive effects.  The annual report statements do not demonstrate anticompetitive effects of the Power Programs for Providers.  In *Advo, Inc. v. Phila. Newspapers*, 51 F.3d 1191, 1199 (3d Cir. 1995), the court held:

> The antitrust statutes do not condemn, without more, such colorful, vigorous hyperbole; there is nothing to gain by using the law to mandate "commercially correct" speech within corporate memoranda and business plans. Isolated and unrelated snippets of such language "provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition." *Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir. 1989).

Also, Defendant presented evidence, which Plaintiff did not dispute, that these agreements involved, at most, 100 to 125 DMEs out of 3,000 to 5,000 total providers, which amounts to 2% to 4.17% of the relevant market.  (Nicoll Dep. at 241.)  This percentage is too small to show any anticompetitive effects on the relevant market.  Therefore, the court grants summary judgment to Defendant on Plaintiff's federal and state restraint of trade claims based on agreements with DMEs and/or outlets.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment as to Remaining Claims (ECF No. 94) for restraint of trade under Federal and State law is hereby granted.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 31, 2008